UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ARCHITETTURA, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:07-cv-1849-M |
| | § | |
| DBSI CUMBERLAND AT GRANBURY LP, | § | |
| HULEN GRANBURY PARTNERS, LTD., | § | |
| and JOHN HILZ, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for Summary Judgment filed by Plaintiff Architettura, Inc. [Docket Entry #75] and the Motion for Summary Judgment filed by Defendants DBSI Cumberland at Granbury LP, Hulen Granbury Partners, Ltd., and John Hilz [Docket Entry #76]. For the reasons explained below, Defendants' Motion is **GRANTED**.

*Background*

This suit arises out of a dispute over the right to use architectural drawings created by Plaintiff Architettura, Inc. ("Architettura") in the course of building an apartment complex in Fort Worth called "Cumberland at Granbury" ("the Project"). In 2004 and 2005, Defendant John Hilz, acting on behalf of Defendant DBSI Cumberland at Granbury ("DBSI") and an associated entity, Defendant Hulen Granbury Partners, Ltd. ("Hulen"), arranged for several architects to submit proposed site plans for the Project. These plans were prepared without cost to Defendants as part of the architects' efforts to be awarded the design contract for the Project. None of the early submissions proved suitable. However, in August, 2005, Architettura, through

1

Frank Pollacia, submitted a proposed site plan that Defendants found suitable at the time,[1] and over the course of the next year, Architettura refined its plan, based on the comments of the Project's contractor, engineer developer, and Fort Worth officials.[2] Several iterations of the plan were produced. The version of the plan relevant to this suit will be referred to as "the Work." Architettura admits that, before November 24, 2006, Defendants had permission to distribute copies of the Work to others involved with the Project, including civil engineers, those providing financing for the Project, and Fort Worth officials.

Architettura prepared the Work without a written contract with Defendants, but Frank Pollacia testified that it was his understanding that Architettura would be paid for, and owned the copyright of, the Work. On October 2, 2006, Pollacia, on behalf of Architettura, sent an email to John Hilz, attaching what Pollacia called the "final version of his contract" and stating that if the contract was not acceptable, then Architettura would send Defendants an invoice for "services rendered and a copyright release for designs utilized."[3] After sending that email, Pollacia and Hilz had a meeting, and events occurring at that meeting indicated to both that Architettura would not be the Project's architect.

On October 3, 2006, Hilz, on behalf of DBSI, contacted another architectural firm, Warren S. Wilke & Associates, Inc., ("WWI") to assume architectural responsibilities for the Project. Hilz met with Warren Wilke, and showed Wilke a copy of the Work. Wilke testified that he reviewed the Work only twice, once during that meeting with Hilz and once a few days later. On October 17, 2006, WWI unveiled its first site plan, which formed the basis for WWI's final plan to build the Project, which incorporated further comments from the Project's

---

[1] In late 2005, Hulen sold the land for the project to DBSI, and was not further involved.
[2] While there were several versions of the site plan produced, the Complaint centers around the version that was shown to WWI; specifically, it was the last version that Architettura produced.
[3] Plaintiff's MSJ App. 83.

developer, civil engineer, contractor, and Fort Worth officials.[4]

On October 19, Plaintiff's attorney sent a letter to Defendants' attorney, demanding payment of $6,594 for Architettura's services on the Project.  Attached to the letter was a release and indemnification agreement, which stated that, in exchange for payment of the invoice, North American Partners, an entity partially owned by Hilz, would receive a nonexclusive, irrevocable right to reproduce the Work and to provide it to another architect.  The release and indemnification agreement further stated that, in exchange for such right, North American Partners would acknowledge that Architettura was the owner of the Work and related intellectual property.[5]  None of the Defendants or North American Partners signed that proposed agreement.  On November 3, 2006, Plaintiff registered its copyright in the Work, effective November 13, 2006.  On November 17, 2006, Plaintiff's attorney sent Defendants' attorney a letter stating that Architettura had a perfected copyright interest in the Work, and that unless it was paid by November 24, 2006, its offer to permit utilization of the Work would be withdrawn.  On December 11, 2006, Plaintiff's counsel sent a letter to Defendants' counsel, accusing Defendants of willful infringement of the copyright on the Work and threatening litigation if the invoice was not paid.  Counsel responded on December 21, 2006, stating that Defendants did not dispute Architettura's claim of ownership of the Work, but denying that Defendants had used it after permission to do so was withdrawn.  After November 24, 2006, WWI's site plan was shown to several third-parties, as well as being posted on the Project's website.

On November 6, 2007, Plaintiff filed a claim for copyright infringement against DBSI

---

[4] Wilke Deposition, Defendant's Response App. at 103.  WWI, like Architettura, made several different versions of its site plan in connection with the Project.  For simplicity, the Court refers to WWI's collective work as its site plan.
[5] "Effective as of the date of this Agreement, Architettura grants NAPD a nonexclusive irrevocable right to reproduce and use the Instruments of Service, including the site plan for the purposes of contracting the facility, and forwarding for use to another Architect.  Provided, however, [Architettura] shall be deemed owner and author of the respected Instruments of Service."

and Hulen, later adding John Hilz as a Defendant.[6] On May 8, 2009, after conducting discovery, both Plaintiff and Defendants moved for summary judgment. The Court first addresses several preliminary matters, and then addresses the merits of the infringement claim.[7]

*Summary Judgment Standard*

Summary judgment is warranted when the facts and law, as reflected in the pleadings, affidavits and other summary judgment evidence, show that no reasonable trier of fact could find for the nonmoving party as to any material fact.[8] "The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case."[9] Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate.[10]

The nonmovant is then required to go beyond the pleadings and designate specific facts that prove the existence of a genuine issue of material fact.[11] In determining whether genuine issues of material fact exist, factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists.[12] A district court properly grants summary judgment if, when viewing the facts in the light most favorable to the nonmovant, the movant shows that there is no genuine issue of

---

[6] WWI was also sued, but was later dismissed.
[7] Defendants have also moved to strike the affidavit of Frank Pollacia and Warren S. Wilke. The Pollacia affidavit is objected to on the basis that it allegedly misstates portions of the November 17, 2006 letter addressed to Defendants. The letter speaks for itself. The Plaintiff's objection to the Wilke affidavit is that it states that WWI's site plans were derivative of the Work. Insofar as this affidavit states a legal conclusion, the Court has not considered it; Wilke's deposition makes clear the scope of his review of the Work.
[8] *See* Fed. R. Civ. P. 56; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).
[9] *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 322-25).
[10] *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).
[11] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[12] *Lynch Props.*, 140 F.3d at 625; *see also Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 338 (5th Cir. 2005).

material fact and that the movant is entitled to a judgment as a matter of law.[13]

*Preliminary Matters*

### I. Nonsuited Claims

The operative Complaint alleges acts of copyright infringement that Plaintiff now admits were not infringing. Specifically, Paragraph 13 of the Complaint alleges that Defendants "provided one or more copies of the Work to a financial institution to obtain preliminary financing in violation of Plaintiff's exclusive right to 'distribute copies . . . of the copyrighted work to the public by sale . . . or lending'" under Section 106(3) of the Copyright Act.[14] Paragraph 14 alleges that Defendants "provided copies of the Work to Alta Construction, for an initial bidding process and for use in determining a preliminary budget," in violation of Section 106(3) of the Copyright Act. Paragraph 15 alleges that Defendants "provided additional copies of the Work to the financial institution after a preliminary budget was determined" in violation of Section 106(3) of the Copyright Act. In addition, Plaintiff attaches a copy of WWI's site plan and asserts that Defendants "prepare[d] derivative works based on the copyrighted work" in violation of Section 106(2) of the Copyright Act, and distributed them to various entities.

In its Motion for Summary Judgment and its briefing in response to Defendants' Motion for Summary Judgment, Plaintiff admits that no infringement of its copyright in the Work occurred before November 24, 2006, and states that its suit is based solely on the allegation that WWI wrongfully created site plans derivative of the Work, once permission to use the Work was withdrawn in November, 2006.[15] Therefore, as Plaintiff has in effect withdrawn claims of

---

[13] Fed. R. Civ. P. 56(c).
[14] Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq*.
[15] "Architettura's copyright claim, however, is not based on Defendants' use of Architettura's site plan prior to its withdrawal of permission on November 24, 2006 . . . [Architettura's] claim is based on Defendants' use of Architettura's site plan *after* Architettura withdrew its permission. Indeed, both Architettura and Defendants agree that until November 24, 2006, Defendants had permission to use Architettura's site plan, and thus no infringement occurred before that date." Plaintiff's Response to Defendants' Motion for Summary Judgment, at 2 (emphasis in

infringement apart from WWI's allegedly derivative use of the Work, Defendants are entitled to judgment on those claims.

## II. License to Use the Work

One question presented is what relationship governed the use of the Work before permission was withdrawn in November, 2006. Defendants argue that Plaintiff granted them an irrevocable, implied license to use the Work. Plaintiff admits the existence of an implied license, but argues it was revocable at will. This issue is significant, because recovery of statutory damages and attorney's fees depends on whether an infringement occurred before or after copyright registration. If Defendants had no license to use the Work, infringement would have occurred before registration, and Plaintiff's recovery would be limited to actual damages. In the alternative, if the license was irrevocable, Plaintiff could not withdraw permission to use the Work, and therefore, as a matter of law, no infringement could have occurred.

The Court concludes that Plaintiff gave Defendants a revocable license to use the work. A nonexclusive license to use a copyright "may be granted orally, or may even be implied from conduct."[16] Here, during their relationship, Plaintiff allowed Defendants to distribute the Work to third parties, such as the City of Fort Worth, and there is no evidence that Plaintiff put other limitations on Defendants' use of the Work. On December 21, 2006, Defendants' attorney returned the copies of the Work,[17] and acknowledged that Architettura held "all rights and ownership of and to [sic] the preliminary drawings prepared by [Architettura]," but refused to pay the invoice or otherwise for services already rendered. In the Court's view, these facts

---

original). *See also* Plaintiff's Response Brief in Support at 4 ("At the point when contract negotiations ceased, Architettura did not withdraw its permission to use the work.") (emphasis in original).

[16] *Jacob Maxwell Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997) (quoting *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) (citing 3 M. Nimmer & D. Nimmer, Nimmer on Copyright, § 10.03[A] (2009) (hereinafter "Nimmer"))). *See Lulirama Ltd., Inc. v. Axcess Broadcast Servs. Inc.*, 128 F.3d 872, 879-80 (5th Cir. 1997).

[17] Plaintiff's Motion Appendix at 98.

establish that a nonexclusive, revocable license was created by the conduct of the parties, but there is no evidence that Plaintiff intended to allow Defendants to use the work indefinitely without any payment for it.

*Copyright Claim*

## I.    Derivative Works

The heart of Plaintiff's claim is whether WWI's site plan was a derivative work under the Copyright Act, and, if so, whether unauthorized use of WWI's site plan constitutes copyright infringement.  Section 103(a) of the Copyright Act provides that the subject matter of a copyright includes derivative works,[18] which are defined as:

> [A] work based upon one or more pre-existing works, such as a translation, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

Therefore, "any work based in whole, or in substantial part, upon a pre-existing (or "underlying") work . . . if it is not itself an infringing work," is a derivative work.[19]  A further requirement is that a derivative work must be *substantially* copied from a prior work.[20]  As the leading copyright treatise concludes, the requirement of substantiality means that a work will be considered derivative "only if it would be considered an infringing work if the material that it has derived from a pre-existing work had been taken without the consent of a copyright proprietor of such pre-existing work."[21]

Here, whether WWI's site plan was derivative is in dispute.  Plaintiff claims that WWI's

---

[18] Each successive version of the site plan WWI prepared was, in terms of copyright law, a new derivative work. *See* 1-2 Nimmer on Copyright § 2.03[B] (stating that eligibility for statutory copyright requires that a work be "fixed in any tangible medium of expression.") (citing 17 U.S.C. § 102(a)).
[19] *See* 1-3 Nimmer on Copyright § 3.01
[20] *See Vault Corp. v. Quaid Software, Ltd.*, 847 F.2d 255, 267 (5th Cir. 1988); 1-3 Nimmer on Copyright, § 3.01.
[21] *Id.*, n.10 (collecting authority).

site plan was derivative of the Work, and Defendants claim that WWI "started from scratch" in creating its site plan. Therefore, the Court must first determine whether WWI's site plan would be infringing of the Work if it had been made without a license.

    A.    <u>Infringement</u>

In order for a plaintiff to establish infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of the constituent elements of the work that are original."[22] The presence of a valid copyright registration certificate constitutes *prima facie* evidence that the copyright is valid.[23]

In order to determine whether actionable copying has occurred, two further inquiries must be made. The first is "whether the alleged infringer copied, or actually used the copyrighted material in his own work."[24] Such copying can be proven by direct or circumstantial evidence,[25] but all copying is not necessarily infringing.[26] The second question is "whether "substantial similarity" exists between the copyrighted work and the allegedly infringing work."[27] In order to determine whether substantial similarity exists, "a side-by-side comparison must be made between the original and the copy, to determine whether a layman would view the two works as substantially similar."[28] In the Fifth Circuit, copyright infringement may not be found without such a side-by-side comparison,[29] and the issue of whether the second was substantially copied from the copyrighted work "typically should be left to the factfinder."[30]

---

[22] *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 360 (1991).
[23] 17 U.S.C. § 410(c).
[24] *Bridgmon v. Array Systems Corp.*, 325 F.3d 572, 576 (5th Cir. 2003) (citing *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994)).
[25] *Id.* (citing *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946)).
[26] *Eng'g Dynamics, Inc.*, 26 F.3d at 1341.
[27] *Id.*
[28] *Creations Unlimited v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997) (per curiam).
[29] *Id.*
[30] *Id.*

### 1. Ownership of a Valid Copyright

Here, Plaintiff has produced evidence that it owns a valid copyright registration certificate, the validity of which is not disputed.

### 2. Actionable Copying

#### a) *Use of copyrighted material*

Plaintiff argues that Wilke repeatedly states in his deposition that the Work was the "basis" of WWI's site plan, thereby providing direct evidence of copying. Defendants dispute this, arguing WWI "started from scratch."

Wilke testified in his deposition that John Hilz showed him the Work during their first meeting in October, 2006. During his deposition, Wilke reviewed a copy of the Work, annotated with notes Wilke made during the meeting with Hilz. Wilke further testified that, while Hilz never instructed him to copy anything, he used the Work as "a basis in terms of our data and program to start our—our design, because we [had] minimal time." Wilke was later asked whether reviewing the Work cut down on the time and effort WWI was required to spend on the site plan. He answered:

> It basically gave us a running start . . . because, you know, the city had blessed the concept, from my understanding . . . my assumption was if we could save time using it, we would use it. . . . I could tell you what a site plan pretty much is going to look like to start with when you get a site like this . . . . But the fact that we had an established program and units gave us a bit of a running start.[31]

In response, Defendants' counsel asked "My understanding is even though you did look at this, it gave you a running start, did you also start from scratch and do your own site plan?" Wilke answered "yes."

Taking the evidence in the best light for Defendants, this evidence establishes copying, because WWI, in creating its work, used Plaintiff's material as a template or inspiration for the

---

[31] Many of the similarities were dictated by City of Fort Worth requirements or directives from other parties.

final product.[32]

                *b)*      *Substantial similarity*

The Court has performed a side-by-side review of the Work and WWI's site plans, and concludes that substantial similarity or lack thereof cannot be determined as a matter of law. The site plans look generally similar, as both feature a large, open area surrounded by residential buildings, and the configurations of the buildings and amenities are roughly similar, with the residential buildings arranged in a rough circle around the clubhouse. The clubhouses and pools are near the open space in the center of the plot in both plans, and both clubhouses connect to Granbury Road near the eastern side of the complex. The location of the laundry, car wash, and maintenance facilities are likewise very similar in both plans.

However, despite the general similarities, there are several significant differences in the two site plans. Most notably, they differ in the arrangement of the building types within the facility, and in the location of ponds, parking, and athletic facilities, among other things. Both are plans for the same plot of land, and are subject to similar requirements from the City of Fort Worth, the developer, the Project engineer and the contractor.[33] The Fifth Circuit has held that, where similarities between two works are dictated by the requirements of the market and standard industry practice, evidence of such industry practice is proper in the context of the substantial similarity analysis.[34] Despite the fact that both parties move for summary judgment, the Court cannot determine whether the similarities constitute substantial copying as a matter of undisputed fact. Accordingly, insofar as Plaintiff moves the Court to declare WWI's site plan a derivative work, and Defendants move to hold WWI's work original, both Motions are denied.

---

[32] 4-13 Nimmer at § 13.01 n.25.5 (citing *Trek Leasing Inc. v. United States*, 66 Fed. Cl. 8, 11 (2005)).

[33] Frank Pollacia testified that features such as the number of units, the existence of a car wash, parking, clubhouse, and swimming pool were dictated by other parties as part of the "developer program." Defendants' MSJ App. at 12.

[34] *Plains Cotton Coop. Ass'n v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1262 and n.4 (5th Cir. 1987) (affirming denial of preliminary injunction on alleged copyright infringement claim where similarities were dictated by industry practice).

## II. Derivative Works Exception

In the alternative to claiming that the WWI site plan was not derivative of the Work, Defendants claim that even if it were, Defendants are protected by 17 U.S.C. § 203(b)(1), the "Derivative Works Exception," which provides that notwithstanding a termination of a license,

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

Therefore, if the author of a novel has authorized the preparation of a motion picture based on the novel, even after the termination of rights in that novel, the grantee will have the right to continue to "utilize" the film made under the license.[35]

Plaintiff argues that the Derivative Works Exception does not apply to situations where, as here, a revocable license of indefinite duration has been terminated by the grantee. Instead, Plaintiff argues that the Derivative Works Exception applies only to statutory terminations of licenses, a situation governed by 17 U.S.C. § 304(c)(6)(A), which is similar in phrasing to 17 U.S.C. § 203(b)(1).[36] The Court rejects this argument. In *Korman v. HBC Florida, Inc.*, the Eleventh Circuit applied Section 203 to an oral, implied license of indefinite duration, indistinguishable from that at issue here. As the *Korman* court noted, the plain language of Section 203 covers *all* nonexclusive grants of a license executed after January 1, 1978, including implied, oral licenses that are revocable at will.[37] Section 203(b) applies to "all rights under this

---

[35] *See* 3-11 Nimmer on Copyright § 11.02.

[36] A statutory termination is a procedure found in the Copyright Act which allows a grantor to terminate the rights of a grantee after a certain number of years, notwithstanding the actual language of the grant. As explained below, the Supreme Court has examined the two sections together. *See* note 38, *infra*.

[37] *Korman v. HBC Florida, Inc.*, 182 F.3d 1291 (11th Cir. 1999). *See also* 3-11 Nimmer on Copyright § 11.02 n.2 ("Non-exclusive grants were included in the right [of termination] on the strength of the argument that, otherwise, there would be nothing to prevent a transferee from avoiding the effect of the provision by compelling the author to grant him a perpetual non-exclusive license along with a statutorily limited transfer of exclusive rights.") (citing Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965

title that were covered by the terminated grants."[38]  Accordingly, the Derivative Works Exception applies here.

The Court next turns to the question of what terms govern the implied license Architettura gave Defendants to use the Work.  The Supreme Court, in the landmark case of *Mills Music, Inc. v. Snyder*,[39] interpreted the phrase "the terms of the grant" in § 304(c)(6)(A) in resolving who owned the royalty rights to a musical composition, "Who's Sorry Now."[40]  The original copyright was registered, in 1923, to a publishing company partially owned by Snyder.  When that company went bankrupt, the trustee assigned the copyright to publisher Mills Music, and in 1940, Mills Music and Snyder made an agreement by which Snyder assigned his interest in the copyright renewals to Mills Music, in exchange for Mills Music's promise to pay royalties to Snyder, including half of all royalties received for mechanical reproductions of "Who's Sorry Now."  In 1951, Mills Music registered the copyright, and then issued 400 licenses to record companies, authorizing recordings of the song, splitting the royalties with Snyder.  In 1978, Snyder's heirs terminated Mills Music's rights, pursuant to the statutory termination provision.  The dispute involved whether Snyder's heirs were entitled to only fifty percent of the royalties from derivative recordings of the song made before termination, as was agreed to in the *original* 1940 grant from Snyder to Mills Music, or whether Snyder's heirs were entitled to all such royalties.

The Supreme Court held that an entitlement to continue to distribute derivative works under the Derivative Works Exception depends on the terms of the license.  The Court held that,

---

Revision Bill, 89th Cong., 1st Sess., Copyright Law Revision Part 6, p. 73).
[38] 17 U.S.C. § 203(b).
[39] 469 U.S. 153 (1985).
[40] The *Mills Music* decision described § 203 and § 304 as "comparable," stated that the two Sections were "counterparts" of each other, and cited to the legislative histories of both in analyzing the purposes of § 304.  Similarly, in construing § 203, this Court is informed by decisions construing § 304.

in *Mills Music*, the "terms of the grant" included "the entire set of documents that created and defined each licensee's right to prepare and distribute [the] derivative work."[41] Because Mills Music was entitled to a share of the royalty under the terms of the grant in effect at the time of termination, under the Derivative Works Exception, it was entitled to receive that share after its rights were otherwise terminated.[42] As stated by the Second Circuit, the *Mills Music* holding intends "to preserve during the post-termination period the panoply of contractual obligations that governed pre-termination uses of derivative works by derivative work owners or their licensees."[43] Thus, in order to determine which party is entitled to post-termination distributive rights, the Court must examine what rights each party was entitled to before termination.

 Here, the evidence establishes that before the license was terminated, there were no restrictions on Defendants' use of the drawings. Frank Pollacia testified at the deposition that he never put any restrictions on the use of the Work, until his attorney's demand letter of November 17, 2006.[44] The uncontroverted evidence shows that the terms of the license allowed Defendants to show the Work to anyone they wished, until the license was terminated.[45]

However, finding that the terms of the license authorized Defendants to show WWI the Work before termination of the license does not end the inquiry. Plaintiff next argues that, because WWI made several changes to its site plan after Architettura terminated its license, it created new derivative works that are "based upon" the Work plan, and therefore do not fall within the Derivative Works Exception.

The Court holds that the Derivative Works Exception applies to derivative works that

---

[41] *Id.* at 167.
[42] *Id.* at 177.
[43] *Woods v. Bourne Co.*, 60 F.3d 978, 987 (2d Cir. 1995).
[44] Defendants' MSJ App. at 20-21 ("Q: Did you ever put any restrictions on your site plans for their use? A: No.").
[45] Although Pollacia did not believe it was appropriate for an architect to review another architect's work, his belief does not establish that any restrictions were placed on the license given to Defendants. *See* Defendants' MSJ App. 13.

were created pursuant to the terms of a license, after its termination, provided that the post-termination changes are wholly unrelated to the original work.  In other words, if post-termination changes made to the derivative work do not incorporate the copyrighted work, such changes fall under the Derivative Works Exception.  This holding is consistent with the purposes of the Derivative Work Exception, balancing the rights of the originator with those of owners of derivative works created before termination.[46]  As the Second Circuit noted, "Without the Exception, the creator of a derivative work (and indeed, the public at large) could be held hostage to the potentially exorbitant demands of the owner of the copyright in the underlying work."[47]  Here, Defendants only showed the Work to WWI during the time in which such use was authorized.  If the Court were to read the Derivative Works Exception as Plaintiff urges, it would create an absurd result: after the date of termination, WWI could still use site plans created prior to that date, but no further changes could ever be made, even if those changes were dictated by the City of Fort Worth or the Project's developers.  Because the plans were not yet finalized, this would effectively force WWI to destroy any work it had previously done on the Project, just short of completion.  Such a result would also prevent WWI from doing things as mundane as signing the completed site plan or affixing to it a corporate logo.  This result would clearly be contrary to the purposes of the Derivative Works Exception.

Professor Nimmer analyzes a hypothetical in which a motion picture based on a novel has been filmed under the terms of a license, but, before a musical score can be added, the author

---

[46] As the Supreme Court noted in *Mills Music*, the House Report with respect to § 203 stated that "A provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited. Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved." *Mills Music*, 469 U.S. at 173 n.39 (quoting H.R. Rep. No. 94-1476, at 124, U.S. Code Cong. & Admin News 1976, p.5740)). In addition, the House Report indicates that, through 203(b), "notwithstanding a termination, a derivative work prepared earlier may 'continue to be utilized' under the conditions of the terminated grant." 469 U.S. at 174 n.40 (citing H.R. Rep. No. 94-1476, at 127, U.S. Code Cong. & Admin. News 1976, p.5743)).
[47] *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 22 (2d Cir. 1998).

terminates the rights to use the novel. Instead of having to throw away the entire project, Nimmer states that material added after the termination date "may be used if, and to the extent that such additional material is not in itself based upon the underlying work the rights in which has been terminated." So long as the "music in itself is not derived from the terminated novel, it should be held that such a score may be added to the film without infringing any rights in the underlying novel."[48] Here, all the changes WWI made to its site plan after the termination had nothing to do with the Work. Therefore, the Derivative Works Exception applies to such use, and no infringement occurred as a matter of law.

*Conclusion*

In making this ruling, the Court does not pass judgment on the propriety of Defendants' actions in refusing to pay for use of the Work. However, Defendants did not infringe Plaintiff's copyright, and thus are entitled to summary judgment that Plaintiff take nothing on its claims.

**SO ORDERED**.

August 24, 2009.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**

---

[48] 3-11 Nimmer on Copyright § 11.02 n.65.